**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

In re:

Recaudo Bogotá S.A.S.,

Debtor in a Foreign Proceeding.
_____________________________________/

Chapter 15

Case No. 18-24241-___

**VERIFIED PETITION FOR RECOGNITION OF FOREIGN PROCEEDING AND MOTION FOR ORDER GRANTING RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 1515, 1517, AND 1520**

Petitioner Per Gabell, the duly authorized and appointed foreign representative of Recaudo Bogotá S.A.S. (the "Debtor"), the above-captioned Debtor that is subject to an insolvency proceeding in the Republic of Colombia commenced pursuant to Colombian insolvency Law No. 1116 of 2006 (the "Foreign Proceeding"), by and through his undersigned counsel, respectfully submits this verified petition (the "Verified Petition") in furtherance of the form of voluntary petition (the "Form of Voluntary Petition") [ECF No. 1] filed concurrently herewith (this Verified Petition, together with the Form of Voluntary Petition, the "Petition") and hereby requests that the Court enter an order substantially in the form annexed hereto as Exhibit A (the "Proposed Order") pursuant to sections 1515, 1517, and 1520 of title 11 of the United States Code 11 U.S.C. §§ 101-1532 (2012) (the "Bankruptcy Code"):[1]

a) granting recognition, pursuant to section 1517, of the Foreign Proceeding as a foreign main proceeding, as defined in section 1502(4), with respect to the Debtor;

b) recognizing the Petitioner as the foreign representative, as defined in section 101(24), of the Debtor with respect to the Foreign Proceeding;

c) finding that the interests of creditors and other interested entities, including the Debtor, are sufficiently protected under section 1522; and

[1] Unless otherwise noted, all sections referenced herein refer to sections of the Bankruptcy Code.

d) granting such other and further relief as the Court deems just and proper.

In support of this request, the Petitioner refers the Court to the verified statements in this Verified Petition, and the Petitioner further respectfully represents as follows:

**Preliminary Statement**

On February 22, 2018, the Debtor commenced its Foreign Proceeding in accordance with Colombian insolvency Law No. 1116 (the "Colombian Bankruptcy Law") by filing a voluntary petition (the "Law 1116 Petition") with the Colombian Superintendency of Companies. The Debtor intends to reorganize under the Colombian Bankruptcy Law and, at a subsequent date, Petitioner anticipates that he will seek an order from this Court enforcing the Colombian confirmation order in the United States.

Accordingly, in support of the reorganization already underway in Colombia and to ensure the continued, critical function of the Debtor's operations, the Petitioner seeks recognition of the Foreign Proceeding as a foreign main proceeding with respect to the Debtor.

**Jurisdiction, Eligibility and Venue**

1. This Court has jurisdiction to consider this Petition pursuant to sections 157 and 1334 of title 28 of the United States Code.

2. This case (the "Chapter 15 Case") has been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of this Petition for recognition of the Foreign Proceeding as a foreign main proceeding with respect to the Debtor pursuant to section 1515 of the Bankruptcy Code. This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code.

3. Venue is proper in this Court pursuant to section 1410(1) of title 28 of the United States Code. Section 1410(a) provides that venue for a case under chapter 15 of the Bankruptcy Code lies where the debtor has its principal U.S. assets or principal place of business. Here, the

Debtor's principal U.S. assets are funds held in a bank account with Colombian-based Banco Davivienda located in Miami, Florida with an account balance of USD $321,896.37 as of October 23, 2018. Therefore, venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1410(1).

4. The presence of assets within the United States renders the Debtor eligible to file this Chapter 15 Case pursuant to section 109(a) of the Bankruptcy Code. *See In re Suntech Power Holdings Co*, 520 B.R. 399, 416 (Bankr. S.D.N.Y. 2014) (holding that establishing a deposit account in New York "had the effect of establishing a basis for venue in [the Southern District of New York] under 28 U.S.C. § 1410(1)"); *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247 (2d Cir. 2013) (applying section 109(a)'s local property requirement to chapter 15 cases); *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372 (Bankr. S.D.N.Y. 2014) (holding cash in client trust account maintained by the foreign representative's U.S. counsel satisfied the section 109(a) requirement); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017) (citing a retainer held by New York counsel in a New York account as a factor satisfying section 109(a) of the Bankruptcy Code and establishing venue); *In re U.S. Steel Canada Inc.*, No. 17-11519 (Bankr. S.D.N.Y. June 29, 2017) (granting recognition of a case where the foreign representative had cited the presence of a retainer in New York as the basis for venue); *In re Berau Capital Resources Pte Ltd.*, 540 B.R. 80 (Bankr. S.D.N.Y. 2015) (holding that attorney retainer held by a foreign representative's New York counsel and the presence of New York choice of law and forum selection clauses in an indenture each independently satisfy the section 109(a) requirement).

5. Sections 1515, 1517, and 1520 of the Bankruptcy Code form the statutory predicates for the relief requested.

## Relief Requested

6. The Petitioner requests that this Court enter an order, substantially in the form of the Proposed Order attached hereto and pursuant to sections 1515, 1517, and 1520 of the Bankruptcy Code:

a) recognizing the Foreign Proceeding as a foreign main proceeding with respect to the Debtor, pursuant to section 1517 of the Bankruptcy Code;

b) recognizing the Petitioner as the foreign representative of the Debtor, as that term is defined in section 101(24) of the Bankruptcy Code, with respect to the Foreign Proceeding; and

c) granting such other and further relief as the Court deems just and proper

(the "Requested Relief").

## Background

### A. History and Operations

7. The Debtor is a private company headquartered in Bogotá, Colombia, and duly incorporated under the laws of the Republic of Colombia in 2011. The Debtor was incorporated with the primary purpose of managing and operating a new integrated fare collection system—designed to eliminate the need for cash—for public buses in Bogotá known as Sistema de Recaudo Control e Información y Servicio al Usuario ("SIRCI") and applying it to the Integrated Transportation System ("SITP"), which is the new public bus transportation system for Bogotá. The implementation of the SITP began in 2006 and remains ongoing. A Colombian company known as Transmilenio S.A. is responsible for the operation of the SITP.

8. The SITP is comprised of four components: (i) infrastructure; (ii) service (based on a fleet of buses); (iii) technology (related to the control of buses, route information and payment collection system); and (iv) fares (eliminating the use of cash, and, instead, using a smart electronic card as the only method of payment).

9. The implementation of the SITP contemplates four phases:

- Phase 1: Preparation for the implementation of SITP (a selection process through a public bid process for the relevant concession);
- Phase 2: Gradual implementation of the project, based on milestones established under the concession granted on Phase 1;
- Phase 3: Complete operation of the SITP for bus transportation; and
- Phase 4: Integration with other types of transportation.

10. On April 25, 2011, a bid process was opened to find a company to implement SIRCI. SIRCI is a complex network of software, hardware, and other components that can be used to manage (i) collection of fares; (ii) control centers; (iii) information and customers service; and (iv) connectivity of the SITP, and which will work in concert with SITP.

11. After being deemed the successful bidder, on August 1, 2011, the Debtor was awarded a concession for the implementation and application of SIRCI to the SITP (the "Concession") pursuant to which the Debtor executed a Concession agreement (the "Concession Agreement"), effective as of August 1, 2011. The Concession includes (i) the design, supply, implementation, operation and maintenance of the collection subsystem, the information and user services subsystem, and the information integration and consolidation subsystem; (ii) the design, supply, deployment, management and maintenance of the fleet control subsystem; and (iii) the provision of connectivity and integration between the collection subsystem, the bus fleet control subsystem, the information and user service subsystem, and the information integration and consolidation subsystem for the public transport system in Bogotá. On December 28, 2014, the Debtor entered into a joint accounts agreement with LG CNS Colombia S.A.S. ("LG CNS") pursuant to which LG CNS is obligated to provide additional maintenance and support for SIRCI.

12. The Concession Agreement was executed on August 1, 2011 and contemplates the following three stages: (i) pre-operation stage; (ii) operation stage; and (iii) reversion stage. Under the Concession Agreement, the Concession will co-exist with other contracts or concessions for the operation of the SITP and other activities related to it, particularly with other concession agreements executed for the collection and operation of the first two phases of the SITP referred to above (the "Ancillary Concessions"). Once the Ancillary Concessions are terminated, the Debtor is required to step in and manage and operate such phases.

**B. Organization and Equity Ownership**

13. The Debtor has the following three shareholders (the "Shareholders"):

- Land Developer Inc. (20% of equity), a company with vast experience in large-scale projects over Latin America;
- LG CNS Co. Ltd. (20% of equity), a company with expertise in collection and technology; and
- Citymovil Colombia S.A.S. (60% of equity).

**C. Company Assets**

14. As of September 30, 2018, the Debtor's assets amounted to local currency COP $565,532,304,233, and its equivalent in USD $190,275,254, the vast majority of which are located in Colombia and, since its inception, nearly all (if not all) of the Debtor's revenues have been derived from Colombian operations.

15. The Debtor also owns certain limited U.S. assets. At present, these assets are comprised primarily of (i) a bank account held by the Debtor at Banco Davivienda (Miami branch) containing approximately $321,696.37; and (ii) certain intangible assets which may be found to be U.S.-located property, including New York-law governed debt documents.

**D. Debt Structure**

16. The Debtor's present funded indebtedness totals approximately local currency COP $299,246,358,297, and its equivalent in USD 100,682,448, this amount corresponds to the financial principal, and is not inclusive of any other amount, such as interests or fees related to the senior loan or subordinated loan, comprised primarily of the following prepetition agreements entered into by the Debtor to obtain the funds necessary to develop and operate SIRCI and comply with its obligations under the Concession Agreement:

- *Common Terms Agreement*: dated as of November 14, 2012, and amended by certain Omnibus Amendment and Waiver No. 1, dated as of March 5, 2013 (the "CTA"), by and among the Debtor (as borrower), The Export-Import Bank of Korea ("Kexim"), HSBC Bank USA, National Association ("HSBC"), Shinhan Bank ("Shinhan"), Woori Global Markets Asia Limited ("Woori"), and International Finance Corporation ("IFC"). Pursuant to the provisions stated in CTA, Kexim, HSBC, Shinan Woori and IFC (collectively, the "Lenders") agreed to lend up to USD $176,000,000 to the Debtor. The CTA is the framework agreement that regulates the general terms, conditions, covenant and event of default that applies to the Debtor to obtain and maintain the finance.

- *Kexim Facilities Agreement*: dated as of November 14, 2012, by and among the Debtor, KEXIM, HSBC, Shinhan and Woori, for an amount up to USD $121,000,000, of which an amount of USD $88,543,000 has been disbursed.

- *Loan Agreement IFC-A*: between the Debtor, dated as of November 14, 2012, by and between the Debtor and IFC, for an amount up to USD $30,000,000, of which an amount of USD $13,500,000. (Together with the Kexim Facilities Agreement, the "Preferential Loan Agreements".)

- *Subordinated Loan Agreement IFC-C*: dated as of November 14, 2012, between the Debtor and IFC (the "Subordinated Loan Agreement", and together with the CTA and the Preferential Loan Agreements, the "Loan Agreements)", for an amount up to US$25,000,000, of which an amount of USD $25,000,000 has been disbursed.

17. Pursuant to the Loan Agreements, and to protect the Lenders' rights under these agreements, the Debtor, the Sponsors (as defined below) and other third parties as defined below, entered into several security agreements (the "Security Documents").[2]

18. Pursuant to the Loan Agreements, the Security Documents, and in consideration of the costs for developing and operating the Concession according to the financial projections made by the Debtor, the Debtor's project costs and initial financial plan were as follows:

---

[2] The Security Documents include the following agreements:

- *Project Funds and Share Retention Agreement*, dated February 8, 2013, by which the Shareholders and EDTM Konsultores EU (together the "Sponsors"), obligated themselves to finance certain deficit of funds that the Debtor might face pursuant to the operation of the Concession, up to USD $5,000,000 (the "Sponsors Agreement").
- *Contrato de Prenda sobre Acciones* ("First Degree Pledge over Shares"), dated February 11, 2013, by which the Sponsors granted a first-degree pledge over 100% of their shares on the Debtor, to secure the rights of the Lenders under the Preferential Loan Agreements.
- *Contrato de Prenda sobre Acciones* ("Second Degree Pledge over Shares"), dated February 11, 2013, by which the Sponsors granted a second-degree pledge over 100% of their shares on the Debtor, to secure the rights of the Lenders under the Subordinated Loan Agreement.
- *Contrato de Prenda sobre Cuotas Sociales*, dated February 11, 2013, by which Doers Transportation Ltd granted a 100% pledge over its interest in EDTM Konsultores EU, to secure the obligations of Citymovil Colombia S.A.S and EDTM Konsultores EU under the Sponsors Agreement.
- *Contrato de Cesión Condicionada* (Conditional Assignment of the Concession Agreement), dated February 17, 2013, by which the Debtor will assign the Concession Agreement to the Lenders if an event of default arises pursuant to the Loan Agreements.
- *Cartas de Crédito* (Letters of Credit), issued by the Debtor and the Sponsors pursuant to the Loan Agreements and the Sponsors.
- *Contrato de Cobertura* (ISDA Master Agreement), dated March 5, 2013 by and between the Debtor and IFC, by which the Debtor obtained coverage for the risk of devaluation of Colombian currency.
- *Otrosí No.1 al Contrato de Fiducia Mercantil Irrevocable de Garantía, Administración, Fuente de Pago y Pagos No. 4-2-0371* (Trust Agreement), dated January 10, 2013, by and between the Debtor and Fiduciaria Davivienda S.A., by which the Lenders were appointed as beneficiaries of the trust.
- *Intercreditor and Security Sharing Agreement*, dated February 8, 2013 by and among the Lenders of the Preferential Loan Agreement, IFC as whole lender of the Subordinated Loan Agreement, and HSBC as security agent.

By reciting the existence of these Security Documents, the Debtor does not concede that any of the security interests described therein were properly granted, perfected and accorded the stated priority in accordance with applicable law.

| **Project Costs** | | |
|---|---|---|
| **Costs** | **Amount (US$ million)** | **%** |
| Capital Investments | 192.6 | 72 |
| Financial Costs | 57.8 | 22 |
| Reserve Account for Debt Service | 17.1 | 6 |
| **Total** | **267.4** | **100** |

| **Initial Financial Plan** | | |
|---|---|---|
| **Source** | **Amount (US$ million)** | **%** |
| Loan Agreements | 151 | 56 |
| Subordinated Loan Agreement | 25 | 9 |
| Capital | 25 | 9 |
| Operation Incomes | 67.4 | 25 |
| **Total** | **267.4** | **100** |

19. However, as explained in more detail below, the Debtor was prevented from borrowing all the amounts provided for under the Loan Agreements.[3] Thus, as of September 30, 2018 the Debtor's debt structure is as follows:

| **Current Debt Structure** | | |
|---|---|---|
| **Source** | **Amount (USD $)** | **%** |
| Preferential Loan Agreements | 75,359,583[4] | 42.6% |
| Subordinated Loan Agreement | 24,046,862 | 13.6% |
| Sponsors Debt | 5,000,000 | 2.8% |
| **Total Financial Debt** | **104,406,446** | |
| Operation Debt | 72,607,105[5] | 41.0% |
| **Total Debt** | **177,013,550** | |

[3] Pursuant to terms of the Loan Agreements, certain conditions are required to be satisfied before the Lenders will disburse the full amounts agreed to under the respective Loan Agreements. Due to delays in the implementation of SIRCI, in some instances such disbursement requirements were not met and, therefore, to date the Lenders have not disbursed all funds provided for under the Loan Agreements.

[4] The amount of senior and subordinated loan includes principal, current interest and default interest.

[5] The operational debts include all liabilities less financial liabilities.

20. Proceeds from indebtedness funded pursuant to the Loan Agreements is being used to fund the Debtor's operations. In addition, the Debtor utilizes cash from operating activities in accordance with the Concession Agreement. However, such cash proceeds are insufficient to service the debt under, and accordance with the terms of, the Loan Agreements.

**E. Events Precipitating Commencement of the Foreign Proceeding**

21. Pursuant to the Concession Agreement, the Debtor is obligated to implement SIRCI which, as set forth above, is a new technological platform consisting of an integrated system, eliminating the use of cash, and, instead, using a smart electronic card as the only method of payment.

22. To fulfill its obligations and implement SIRCI under the Concession Agreement, the Debtor obtained loans from international banking institutions pursuant to the Loan Agreements, which comprise the majority of the Debtor's prepetition indebtedness.

23. According to the information provided to bidders during the tender process, the complete implementation of SIRCI was projected to have occurred by September 2013. Thus, the initial cash flow and financial plan prepared by the Debtor was based on the assumption that SIRCI would be 100% implemented more than five years ago.[6] However, as of the date hereof, and due to various project delays, less than 70% of the SIRCI has been implemented.

24. In furtherance of its obligations under the Concession Agreement, the Debtor acquired all equipment necessary for charging fees in respect of 100% of the bus fleet in 2013. Yet the entire SITP fleet has still not been put into service. As a result of this partial system implementation, all project costs were pre-funded by the Debtor, with only a portion of the expected revenue actually being collected to date.

[6] The Debtor's revenues are based on the fees the Debtor charges for operating SIRCI. The fees are directly related to, and at this time negatively impacted by, the percentage of system implementation in place.

25. The delay in the deployment of the SITP bus fleet resulted in the Lenders electing not to disburse the remaining available funds under the Loan Agreements (i.e., almost 28% of the amount agreed in the Loan Agreements was not disbursed due to Lenders' claims that financial conditions for disbursement could not and would not be met). The Lenders' refusal to disburse these proceeds made it impossible for the Debtor to purchase necessary currency hedges which, in turn, resulted in debt payments practically doubling (due to fluctuations in the Peso/Dollar exchange rate). An average exchange rate of 1,814.73 Colombian Pesos per dollar was established for the Loan Agreements, which was supposed to hedge against the currency risk.

26. Despite several campaigns to reduce costs, and revisions of corporate policies to improve operational efficiency, it has been impossible for the Debtor to compensate for the reduction in revenues caused by the partial implementation of the SITP system.

27. Although the Debtor has been working in earnest to service its debt and maximize recoveries on account of debts owed to its creditors, the Debtor determined that the delays in the implementation of the SITP will make it impossible for the Debtor to satisfy 100% of those obligations (if its current contracts are not amended).

28. After the Debtor was unable to make principal and interest payments due on March 2017 pursuant to the payment schedule set forth in the Financial Agreements, the Debtor hired turnaround firm Alvarez & Marsal ("A&M") as its financial advisor. A&M reviewed the Debtor's short-term cash flow and analyzed the Debtor's ability to obtain funds to service its debt payments due on September 2017 and March 2018, respectively. A&M concluded that the Debtor was not in a financial position to make these payments. Moreover, A&M concluded that, for the next three years, the Debtor would only able to pay its operational costs under the

Concession, and would be unable to service the funded debt pursuant to the Loan Agreements. This situation was communicated to the Lenders.

29. Because of the Debtor's ongoing financial distress, on October 10, 2017, the Debtor and its largest creditors held several meetings in Washington, D.C. Pursuant to the projections made by A&M, the parties agreed on a "Financial Base Scenario" that considered the following premises: (i) the Debtor generates sufficient income to cover the operational costs related to the Concession; (ii) during the next three years, the Debtor will suffer a deficit to pay its obligations under the Financial Agreements and other debts with LG; and (iii) the Debtor's medium- and long-term income projections show an increase in the performance of the Debtor, but this increase will be insufficient to pay the Debtor's funded indebtedness by September 2028, as originally contemplated in the Financial Agreements.

30. Based on the Financial Base Scenario, the Debtor proposed to the Lenders, Sponsors and certain other creditors three different alternative plans to commence a restructuring process. The Debtor is still working to restructure its debt with the Lenders, Sponsors, suppliers and other creditors in connection with the Foreign Proceeding. However, the continuing delay in the implementation of the SITP, and the lack of expectations that those implementation problems are going be solved in the short-term, puts the Debtor in a position where it is presently unable to service its funded indebtedness.

### F. <u>Commencement of the Foreign Proceeding and this Chapter 15 Case</u>

31. As a consequence of the financial distress detailed above and after first attempting a number of out-of-court alternatives, the Debtor concluded that a judicially-supervised restructuring proceeding in a centralized forum would best maximize value for all of its stakeholders.

32. Accordingly, on February 22, 2018, the Debtor commenced the Foreign Proceeding by filing a voluntary bankruptcy petition with the Colombian Superintendency of Companies. The Debtor intends to conduct a business reorganization in the Foreign Proceeding, not a liquidation.

33. The Debtor does not have a domicile or any place of business in the United States. The Debtor, however, has borrowed U.S. dollar-denominated funds under instruments governed by New York law, and has selected and consented to the jurisdiction of the courts of the State of New York and the Southern District of New York for any disputes arising under such documents. As such, the Debtor may now vulnerable to enforcement proceedings and other lawsuits in the United States following events of default triggered by commencement of the Foreign Proceeding. At this time, the Petitioner is only requesting recognition of the Foreign Proceeding as a foreign main proceeding. The Petitioner anticipates that the Debtor will obtain confirmation of a reorganization plan in Colombia, at which point the Petitioner will seek an order from this Court giving full force and effect and granting comity in the United States to the Colombian plan and the confirmation order entered in connection therewith, pursuant to sections 105(a), 1145, 1507(a), 1521, and 1525(a) of the Bankruptcy Code.

**G. Present Status and Ongoing Operations**

34. Despite its financial distress, the Debtor anticipates successfully emerging from bankruptcy and continuing to provide the highest level of services in accordance with its obligations under the Concession Agreement.

## Basis for Relief

### A. The Court Should Recognize the Foreign Proceeding as a Foreign Main Proceeding, and the Petitioner as the Duly Authorized Foreign Representative of the Debtor with Respect thereto

35. The purpose of chapter 15 is to "incorporate the Model Law on Cross-Border Insolvency (the "Model Law") so as to provide effective mechanisms for dealing with cases of cross-border insolvency." 11 U.S.C. § 1501(a). Thus:

> The language of chapter 15 tracks the Model Law, with adaptations designed to mesh with United States law. Congress prescribed a rule of interpretation that expressly requires United States courts to take into account the statute's international origin and to promote applications of chapter 15 that are consistent with versions of the Model Law adopted in other jurisdictions.

*In re Pro-Fit Holdings Ltd.*, 391 B.R. 850, 857 (Bankr. C.D. Cal. 2008); *see also Krys v. Farnum Place, LLC (In re Fairfield Sentry Ltd.)*, 768 F.3d 239, 245 (2d Cir. 2014) (quoting statute); *In re British Am. Ins. Co.*, 425 B.R. 884, 899 (Bankr. S.D. Fla. 2010). Accordingly, in interpreting chapter 15, a court is to "consider its international origin, and the need to promote an application of [chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508.[7]

36. Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body, and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517(a); *In re Overnight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 532

---

[7] The legislative history notes that "[i]nterpretation of [chapter 15] on a uniform basis will be aided by reference to the Guide [to Enactment of the UNCITRAL MODEL LAW on Cross-Border Insolvency, U.N. Gen. Ass., UNCITRAL 30th SESS. U.N. Doc. A/CN.9/442 (1997) (the "Guide")] and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well." H. REP. No. 109- 31, PT. 1, 109th Cong., 1st SESS. 109-110 (2005).

(Bankr. S.D.N.Y. 2008). The foregoing requirements are satisfied with respect to the Foreign Proceeding, the Petitioner, and this Petition.

**B. <u>The Foreign Proceeding is a Foreign Main Proceeding</u>**

37. The Foreign Proceeding is a foreign main proceeding and therefore satisfies the first condition for entry of an order recognizing such a proceeding under section 1517(a).

i. *The Foreign Proceeding is a "foreign proceeding" under the Bankruptcy Code*

38. The Foreign Proceeding is a "foreign proceeding" for purposes of chapter 15 of the Bankruptcy Code. Section 101(23) defines a "foreign proceeding" as (1) a collective judicial or administrative proceeding relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) under the supervision of a foreign court and (4) for the purpose of reorganizing or liquidating the assets and affairs of the debtor. *See* 11 U.S.C. § 101(23). The Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." *See* 11 U.S.C. § 1502(3).

39. The Foreign Proceeding meets each element of the definition of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code. The Foreign Proceeding is a Law No. 1116 insolvency proceeding under the Colombian Bankruptcy Law. The Foreign Proceeding is also "collective" in nature. That is, it involves the treatment of multiple creditors and claims together rather than merely the resolution of a two-party dispute. Indeed, the Colombian Bankruptcy Law provides that a proceeding culminates in a reorganization agreement that normally requires approval by (a) a majority of creditor votes where at least (i) three out of five credit creditor classes are represented by affirmative votes, or (ii) in the event that only two or three creditor classes are involved in the proceeding, two of such classes are represented; or (b) otherwise 75% of the total creditors' votes, without taking into account creditor classes. The

reorganization agreement, as contemplated by the "equality" principle contained in the Colombian Bankruptcy Law, is intended to directly or indirectly benefit all creditors collectively rather than to benefit any single creditor alone.

40. Under the Colombian Bankruptcy Law, insolvency proceedings commence upon the filing of the petition. While the court must analyze the petition and supporting documentation to verify that the debtor has met all of the legal requirements for admission, the moment of filing triggers the formal consequences, including restrictions that prevent the debtor from making payments on claims subject to the proceeding or, more generally, disposing of or encumbering its assets outside the ordinary course of business without prior authorization from the court. *Id.* at ¶ 16.

41. As noted above, on February 22, 2018, the Debtor commenced the Foreign Proceeding pursuant to the Colombian Bankruptcy Law. Thus, the Foreign Proceeding has been properly commenced and is therefore pending in a foreign country.

42. The Foreign Proceeding is a judicial proceeding in that it is presided over and supervised by, and may not be dismissed except by order of, the Colombian Superintendency of Companies, whose approval is also necessary for a plan of reorganization to become effective. The Colombian Superintendency of Companies retains jurisdiction to enforce the restructuring plan, including by ordering the judicial liquidation of the debtor in case of breach of the reorganization agreement. Moreover, immediately following the filing of a petition for relief under the Colombian Bankruptcy Law, the Colombian Superintendency of Companies must approve any disposals of or new encumbrances upon any of the debtor's permanent assets.

43. The Foreign Proceeding is pending in a foreign country (Colombia) under a law relating to insolvency, pursuant to which the assets and affairs of the Debtor are subject to the

control and supervision of the Colombian Superintendency of Companies. The Colombian Superintendency of Companies qualifies as a "foreign court" within the meaning of the Bankruptcy Code. In addition, the Colombian Constitutional Court has approved the Superintendency of Companies' process for reorganization, and may be petitioned if questions of law arise.

44. Moreover, courts in this District have consider the question and have held that a Colombian insolvency proceeding under the supervision of the Superintendency of Companies constitutes a "foreign proceeding." *See In re Estrategias en Valores S.A., et al.,* Ch. 15 Case No. 17-16559 (Bankr. S.D. Fla., Jul. 5, 2017) [ECF No. 59].

ii. *The Foreign Proceeding is a "foreign main proceeding"*

45. In addition to qualifying as a "foreign proceeding" under section 101(23), the Foreign Proceeding qualifies as a "foreign main proceeding." *See* 11 U.S.C. § 1502(4). Section 1517(b)(1) of the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has its center of main interests ("COMI") as of the date of the petition for recognition. *See*, *e.g.*, *In re Fairfield Sentry Ltd.*, 714 F.3d 127 (2d Cir. 2013) (affirming recognition of foreign main proceeding); *In re Ocean Rig UDW Inc.*, 570 B.R. at 705 (recognizing foreign main proceeding).

46. The Bankruptcy Code establishes a presumption that a debtor's "registered office" is its COMI. *See* 11 U.S.C. § 1516(c). Here, the Debtor's registered office is in Colombia. Accordingly, it is entitled to the statutory presumption that Colombia is its COMI. The legislative history makes clear, however, that this presumption is rebuttable and that the rule of the "registered office," *i.e.*, "place of incorporation," is "designed to make recognition as simple and expedient as possible" in cases where the facts are not controversial, rather than to establish a conclusive presumption. H. REP. NO. 109-31, PT. 1, 109TH CONG., 1ST SESS. 112–13

(2005); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127–28 (Bankr. S.D.N.Y. 2007). Accordingly, where any "evidence to the contrary" is presented, the presumption does not govern. *Collins v. Oilsands Quest Inc.*, 484 B.R. 593, 595 (S.D.N.Y. 2012).

47. Although neither the Bankruptcy Code nor the Model Law expressly defines COMI, courts have viewed COMI as a concept rooted in substance over form—the debtor's "real seat," as one court put it. *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 130 (Bankr. S.D.N.Y. 2007). That Congress intended a substance-over-form consideration is evidenced by the minor weight afforded the presumption that COMI lies in the jurisdiction of formal registered office. *See, e.g., In re OAS S.A.*, 553 B.R. at 101–02 (rejecting argument that COMI lay in the debtor's letterbox jurisdiction because it had no assets, operations, employees, or other connections to its place of formal incorporation); *In re SPhinX, LTD*, 351 B.R. 103, 119 (Bankr. S.D.N.Y. 2006) (same); *In re Bear Stearns*, 374 B.R. at 129 (same). In short, a COMI analysis inquires as to the debtor's substantive "nerve center"—the center of its purpose, function, business activities, and strategic direction.

48. This substantive inquiry is aided by a set of "factors" courts in this Circuit have developed and may consider when determining a debtor's COMI. These factors include:

> [T]he location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.... the principal place of business . . . [and] the expectations of third parties [as to] the debtor's COMI.

*In re Fairfield Sentry Ltd.*, No. 10 Civ. 7311 (GBD), 2011 U.S. Dist. LEXIS 105770, at *10 (S.D.N.Y. Sep. 15, 2011) (citing *In re Bear Stearns High-Grade Structured Credit Strategies*

*Master Fund, Ltd*, 389 B.R. 325, 336 (Bankr. S.D.N.Y. 2008)) [hereinafter *Bear Stearns II*]; *In re SPhinX, LTD*, 351 B.R. at 117; *In re British Am. Isle of Venice*, 441 B.R. 713, 720 (Bankr. S.D. Fla. 2010)). Courts may consider some or all of these factors. *See Fairfield Sentry,* 714 F.3d at 137 ("Consideration of these specific factors is neither required nor dispositive."); *In re Betcorp Ltd.*, 400 B.R. at 290 ("[C]ourts do not apply any rigid formula or consistently find one [COMI] factor dispositive; instead, courts analyze a variety of factors to discern, objectively, where a particular debtor has its principal place of business."). This flexible, working definition respects that Congress, in declining to provide a definition "for a term that is not self-defining," left the text "open-ended, and invite[d] development by courts, depending on the facts presented, without prescription or limitation." *Fairfield Sentry*, 714 F.3d at 138. Accordingly, courts have tailored their COMI analyses varyingly across a wide range of facts and circumstances.

49. Applying this required substantive analysis to the Debtor, it is clear that its COMI lies in Bogotá, Colombia. The Debtor is a Colombia-incorporated company with its registered offices in Colombia, giving rise to the rebuttable presumption, correct in this instance, that the Debtor's COMI lies in Colombia. The company is run from its headquarters in Bogotá. Further, the Debtor maintains substantially all of its assets and all or nearly all of its employees, management, board of directors, creditors, and business operations in Colombia. This is where the Debtor is managed, directed, and monitored as a strategic whole. All major decisions are made at the Debtor's headquarters, including much of the negotiations and discussions in the months leading up to the Debtor's present restructuring. The Debtor's headquarters serve as the corporate nerve center from which its operations are coordinated and functionally located. It is thus abundantly clear that the Debtor has its COMI in Colombia, and there can simply be no reasonable argument to the contrary.

50. Another important factor in determining the COMI of a Debtor is the "expectations of its creditors." *In re Oi Brasil Cooperatief U.A.*, 578 B.R. 169, 225 (Bankr. S.D.N.Y. 2017); *see also Bear Stearns*, 374 B.R. at 130 (holding that the debtors' COMI was "the place where the [debtors] conduct the administration of their interests on a regular basis and is therefore ascertainable by third parties"). The Debtor's creditors are primarily lenders and contract counterparties the vast majority of whom transacted business with the Debtor in Colombia and are familiar with Recaudo Bogotá S.A.S. as a company with longstanding operations in Colombia. The expectations of these creditors weigh heavily in favor of Colombia as the COMI of the Debtor.

51. In conclusion, the Debtor, as an operating company incorporated, managed, and operating exclusively in Colombia maintains a COMI in Colombia at its corporate nerve center in Bogotá.

**C. <u>The Petitioner is a Proper "Foreign Representative"</u>**

52. The second requirement for recognition of a foreign main proceeding under section 1517(a) of the Bankruptcy Code is that a foreign representative applying for recognition be a person or body. *See* 11 U.S.C. § 1517(a)(2). Section 101(24) of the Bankruptcy Code further explains that the "foreign representative is "a person or body . . . authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

53. Here, the Petitioner is an individual, which is included in the term "person," 11 U.S.C. § 101(41), who has been duly appointed by the Debtor to act as foreign representative in accordance with section 101(24) and authorized to commence this Chapter 15 Case. The Colombian Bankruptcy Law authorizes the Debtor to administer the reorganization of its assets and affairs. As such, the Petitioner satisfies sections 101(24) and 1517(a)(2) of the Bankruptcy

Code. *Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro, S.A.B. de C.V.)*, 470 B.R. 408 (Bankr. N.D. Tex. 2012), *aff'd*, 701 F.3d 1031 (5th Cir. 2012) (holding that an individual appointed as foreign representative by the debtor's board in anticipation of a Mexican *concurso* proceeding, which contemplates "self-management" during the proceeding similar to that of a debtor in possession, fit within the scope of the Bankruptcy Code's definition of "foreign representative," and recognizing the individual as the foreign representative); *see OAS S.A.*, 553 B.R. 83, 93 (Bankr. S.D.N.Y 2015) (citing *In re Vitro, S.A.B. de C.V.*, 701 F.3d 1031, 1046 (5th Cir. 2012)).

### D. **The Petition Was Properly Filed under Sections 1504 and 1509 and Satisfied the Requirements of Section 1515**

54. The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the procedural requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517(a)(3). Here, all of those procedural requirements are satisfied.

55. First, the Petitioner duly and properly commenced this Chapter 15 Case in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by filing its petition with all the documents and information required by sections 1515(b) and 1515(c). *See In re Bear Stearns*, 374 B.R. at 127 ("A case under chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy Code."), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).

56. Second, in accordance with section 1515(b)(1)-(2) and (d) of the Bankruptcy Code, the Petitioner has submitted evidence, translated into English, of the existence of the Foreign Proceeding and the appointment of the Petitioner as foreign representative with respect thereto. *See* Voluntary Chapter 15 Petition [ECF No. 1].

57. Finally, in accordance with section 1515(c) of the Bankruptcy Code, the Petition contains a statement identifying the Foreign Proceeding as the only foreign insolvency proceeding currently pending with respect to the Debtor.[8]

58. For all of the reasons set forth above, the Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied and that Debtor is entitled to all of the relief provided under section 1520 of the Bankruptcy Code.[9] Thus, the Petitioner respectfully asks that the Court enter the Proposed Order attached hereto as Exhibit A recognizing the Foreign Proceeding as a foreign main proceeding with respect to the Debtor.

**E. The Relief Requested Is Not Manifestly Contrary to the Public Policy of the United States**

59. Recognition of the Foreign Proceeding as a foreign main proceeding and the granting of associated relief is not "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506.

60. A court may deny a request for any chapter 15 relief that would be "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. Courts that have addressed this "public policy exception" have noted that it is narrow, its application restricted to the most fundamental policies of the United States, and a foreign judgment should general be accorded comity if the foreign jurisdiction's proceedings satisfy fundamental standards of fairness. *See Collins v. Oilsands Quest Inc.*, 484 B.R. at 597; *see also In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (holding that a U.S. bankruptcy court is not required

[8] This statement is also set forth in the Debtors' *Lists Pursuant to Federal Rules of Bankruptcy Procedure 1007(A)(4) and 7007.1* filed contemporaneously herewith.

[9] Upon recognition of the Foreign Proceeding as a foreign main proceeding, certain relief is automatically granted as a matter of right, including a stay that enjoins actions against and otherwise protects the Debtor. *See* 11 U.S.C. § 1520. In particular, upon the Court's recognition of the Foreign Proceeding as a foreign main proceeding, section 1520(a)(1) of the Bankruptcy Code triggers the automatic stay provisions of section 362 of the Bankruptcy Code with respect to the Debtor.

to make an independent determination about the propriety of the acts of a foreign court, but only whether their procedures meet U.S. standards of fundamental fairness).

61. It is also clear from the legislative history that this "public policy" exception is narrow, to be invoked only when the "most fundamental policies of the United States" may be jeopardized by judicial action taken under chapter 15. H.R. REP. No. 109-31, PT. 1, at 109 (2005). The exception has been interpreted as operating only to ensure that foreign proceedings receiving comity in the United States protect the same fundamental notions of fairness safeguarded under the Bankruptcy Code and other applicable U.S. law. As the *Metcalfe* court observed, "[t]he key determination . . . is whether the procedures used in [the foreign proceeding] meet our fundamental standards of fairness." *In re Metcalfe.*, 421 B.R. at 697. Section 1506 does not require that law governing the foreign proceeding be identical to its U.S. law counterpart; rather, it only requires that fundamental U.S. law notions of substantive and procedural fairness be adequately protected. *See, e.g., In re Rede Energia S.A.*, 515 B.R. 69, 104 (Bankr. S.D.N.Y. 2014) (rejecting arguments that it should deny comity on the basis that the Brazilian bankruptcy law is not identical to U.S. law); *OAS S.A.*, 553 B.R. 83, 103 (Bankr. S.D.N.Y 2015) (holding that objectors "have not mounted a serious challenge to the fairness of [Brazilian RJ proceedings] on a 'macro system' level").

62. In this case, the Foreign Proceeding clearly meets these standards and recognition of the Foreign Proceeding would be consistent with the public policy of the United States and the goal of chapter 15 to afford comity to foreign insolvency proceedings: the Colombian Superintendency of Companies' exercise of jurisdiction over the Debtor and the Foreign Proceeding was proper and consistent with the Colombian Bankruptcy Law; the specific steps undertaken to date in the Foreign Proceeding demonstrate a commitment to due process, which

includes adequate notice and service of process; the steps undertaken and to be undertaken in order for the Foreign Proceeding to ultimately become effective sufficiently conform to U.S. notions of due process; and all of the Debtor's creditors have the rights to participate regardless of their location. The Colombian Bankruptcy Law, like the Bankruptcy Code, provides for a centralized process to assert and resolve claims against the debtor in one tribunal. In addition, the Colombian Bankruptcy Law provides that claims of a same class must be treated equally absent an economic justification for treating a subgroup of claims differently, such as to the need for prioritizing payment of past-due claims of critical suppliers, or to give special treatment to creditors providing the debtor with additional financing during the insolvency proceeding. Finally, the Colombian Bankruptcy Law requires that a plan of reorganization follow certain statutorily defined hierarchy for the priority payment of different classes of claims, including priority for labor and tax claims and the payment of secured claims before unsecured claims, which scheme largely comports with the priority and payment scheme in the Bankruptcy Code.

63. During the course of a reorganization, the Colombian Bankruptcy Law contains robust procedural safeguards for creditors and sets forth a comprehensive procedure for the orderly renegotiation of claims and the equitable distribution of assets among the debtor's creditors in a single, centralized proceeding. Approval of a plan by majority vote requires significant consensus among the creditors of each secured and unsecured class: a majority in both number and face value of claims held by creditors present and voting must approve the plan, provided that such majority is either 75% of total creditor votes or a majority of the creditor classes.

64. Thus, the Foreign Proceeding is governed by a manifestly equitable and orderly process that comports with the United States' standards of substantive and procedural fairness.

As such, the relief requested herein does not violate the public policy of the United States. To the contrary, recognition of the Foreign Proceeding as a foreign main proceeding follows the dictates of chapter 15 to foster comity and cooperation between this Court and the Colombian Superintendency of Companies with the ultimate goal of an orderly forum for a supervised reorganization and an orderly administration of the Debtor's assets. For these reasons, the Petitioner respectfully submits that the Requested Relief should be granted.

**Conclusion**

65. WHEREFORE, the Petitioner respectfully requests that the Court: (a) enter the Proposed Order, upon notice and a hearing, substantially in the form attached hereto as Exhibit A, and (b) grant such other and further relief as may be just and proper.

Dated: November 15, 2018

Respectfully submitted,

GREENBERG TRAURIG, PA

By: */s/ Paul J. Keenan Jr.*

Paul J. Keenan Jr.
FL Bar No. 0594867
keenanp@gtlaw.com

John R. Dodd
FL Bar No. 38091
doddj@gtlaw.com

333 S.E. 2nd Avenue
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

and

GREENBERG TRAURIG, LLP
Ryan A. Wagner
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
E-mail: wagnerr@gtlaw.com

*Attorneys for Per Gabell*
*as Petitioner and Foreign Representative*

**VERIFICATION OF CHAPTER 15 PETITION**

Pursuant to 28 U.S.C. § 1746, I, Per Gabell, declare as follows:

I am the authorized foreign representative of the Debtor with respect to the Colombian Law No. 1116 insolvency proceeding. I have received the factual contents of foregoing Verified Petition, including each of the attachments and appendices thereto from the Debtor and their legal counsels, and I am informed and believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 11/15/2018, 2018

Respectfully submitted,

Per Gabell

**EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

In re:

Recaudo Bogotá S.A.S.,

Debtor in a Foreign Proceeding.
_________________________________________/

Chapter 15

Case No. 18-18-24241-___

**ORDER GRANTING RECOGNITION OF FOREIGN MAIN PROCEEDING AND CERTAIN RELATED RELIEF**

Upon the *Verified Petition for Recognition of the Foreign Proceeding and Motion for Order Granting Related Relief pursuant to 11 U.S.C. §§ 1515, 1517, and 1520* (the "Motion") [ECF No. ___] dated November ___, 2018 (the "Petitioner" or the "Foreign Representative"), in his capacity as the authorized Foreign Representative of Recaudo Bogotá S.A.S. (the "Debtor") in the above-captioned chapter 15 case (the "Chapter 15 Case"), requesting this Order (the "Order") (a) granting the form of voluntary petition [ECF No. 1] and the Motion (together, the "Petition") and recognizing the judicial reorganization (the "Foreign Proceeding") pending before the Colombian Superintendency of Companies pursuant to Colombian insolvency Law No. 1116 (the "Colombian Bankruptcy Law") of the laws of the Republic of Colombia

("Colombia") as a foreign main proceeding with respect to the Debtor pursuant to section 1517 of title 11 of the United States Code (the "Bankruptcy Code"), (b) recognizing the Petitioner as the "foreign representative," as defined in section 101(24) of the Bankruptcy Code, the Debtor with respect to the Foreign Proceeding, and (c) granting such other and further relief as the Court deems just and proper; and it appearing that this Court has jurisdiction to consider the Motion pursuant to sections 157 and 1334 of title 28 of the United States Code; and this Court having reviewed the Motion, the Petition, and the statements of counsel with respect to the Motion at a hearing before this Court (the "Hearing"); and appropriate and timely notice of the filing of the Motion and the Hearing having been given; and no other or further notice being necessary or required; and this Court having determined that the legal and factual bases set forth in the Motion, the Petition, and all other pleadings and papers in this case establish just cause to grant the relief ordered herein, and after notice and a hearing and due deliberation therefor;

**THIS COURT HEREBY FINDS AND DETERMINES THAT:**

A. The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. This Court has jurisdiction to consider this matter pursuant to sections 157 and 1334 of title 28 of the United States Code. This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code. Venue for this proceeding is proper before this Court pursuant to section 1410 of title 28 of the United States Code.

C. The Petitioner is the duly appointed "foreign representative" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code.

D. This Chapter 15 Case was properly commenced pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

E. The Petitioner has satisfied the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 2002(q).

F. The Foreign Proceeding is a "foreign proceeding" pursuant to section 101(23) of the Bankruptcy Code.

G. The Foreign Proceeding is entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

H. The COMI of the Debtor is in Bogotá, Colombia. Accordingly, the Foreign Proceeding is a "foreign main proceeding," as defined in section 1502(4) of the Bankruptcy Code, with respect to the Debtor, and is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.

I. The relief sought by the Motion will not cause undue hardship or inconvenience to any party in interest and, to the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Petitioner, the Debtor, its estate and its creditors.

J. The relief granted hereby is necessary and appropriate to effectuate the purposes and objectives of chapter 15 and to protect the Debtor, its creditors and other parties in interest.

K. Appropriate notice of the filing of and the hearing on the Petition and the Motion was given, which notice is deemed adequate for all purposes, and no other or further notice need be given.

L. The relief granted hereby is necessary and appropriate in the interests of the public and international comity; it is consistent with the public policy of the United States; it is warranted pursuant to sections 1515, 1517, and 1520 of the Bankruptcy Code.

For all of the foregoing reasons, and for the reasons stated by the Court at the hearing and reflected in the record thereof, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1. The Petition and the Motion are granted.

2. The Petitioner is the duly appointed foreign representative of the Debtor within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of the Debtor in this Chapter 15 Case.

3. The Foreign Proceeding is granted recognition as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code with respect to the Debtor.

4. All relief and protection afforded foreign main proceedings under section 1520 of the Bankruptcy Code is hereby granted to the Foreign Proceeding, the Debtor, the Debtor's assets located in the United States, and the Petitioner, as applicable.

5. Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) the Petitioner is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Petitioner is authorized and empowered, and may, in his discretion and

without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

6. This Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order and any requests for additional relief or any adversary proceeding brought in and through this case.

###

**Submitted by:**
Paul J. Keenan Jr., Esq.
Fla. Bar. No. 594687
keenanp@gtlaw.com
GREENBERG TRAURIG, LLP
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Tel: 305-579-0500

*Attorneys for Per Gabell*
*as Petitioner and Foreign Representative*

Paul J. Keenan Jr. shall serve a copy of the signed order on all interested parties and file with the court a certificate of service conforming with Local Rule 2002-1(F).